# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

ELIAS GONZALEZ-RAYMUNDO,

      Defendant-Appellant.

FOR PUBLICATION
November 18, 2014
9:25 a.m.

No. 316744
Wayne Circuit Court
LC No. 12-009127-FH

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

ELIAS GONZALEZ-RAYMUNDO,

      Defendant-Appellee.

No. 319718
Wayne Circuit Court
LC No. 12-009127-FH

Before: BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ.

BOONSTRA, P.J.

Defendant was convicted, following a jury trial, of four counts of third-degree criminal sexual conduct, MCL 750.520d(1)(a) (victim at least 13 years of age but less than 16 years of age).[1] Defendant was sentenced to 5 to 15 years' imprisonment for each conviction. In Docket No. 316744, defendant appeals as of right, arguing that (1) his defense counsel was ineffective for failing to use an interpreter at trial and for failing to properly investigate the case, and (2) the trial court violated his constitutional right to due process by failing to provide him with an interpreter. After filing his claim of appeal, defendant moved this Court to remand the case to the trial court for a *Ginther*[2] hearing on his claim of ineffective assistance of counsel. This Court

---

[1] Defendant was also acquitted of a fifth count of third-degree criminal sexual conduct, MCL 750.520d(1)(a) (victim at least 13 years of age but less than 16 years of age).

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-1-

granted defendant's motion to remand on September 5, 2013.[3] After the *Ginther* hearing, the trial court granted defendant's motion for new trial on the ground that its failure to provide an interpreter violated defendant's constitutional rights. In Docket No. 319718, the prosecution appeals by delayed leave granted[4] the trial court's grant of defendant's motion for new trial. The two cases were consolidated by this Court on February 19, 2014.[5] For the reasons specified below, we affirm the trial court's order granting defendant a new trial in Docket No. 319718, and dismiss as moot defendant's appeal in Docket No. 316744.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of a series of alleged sexual encounters between defendant and his step-nephew, IR, in Lincoln Park, Michigan. IR was born on September 11, 1997, and was approximately seven or eight years old when he first met defendant. Defendant lived in a house directly across the street from the Lincoln Park home of IR's stepfather, Jose Gonzalez, and mother, Rosalba Llamas, where IR also lived.

IR testified that defendant is his step-uncle. When he was 10 or 11 years old, numerous members of defendant's family came to town for Christmas and stayed at defendant's home. Due to the amount of visitors, some people from defendant's home, including defendant, stayed with IR's family for the holiday in the home where IR, Llamas, and Gonzalez lived. IR testified that, at Llamas' instruction, he and defendant slept in the same room, and the same bed, during the Christmas holiday season.[6] Gonzalez disagreed with IR's testimony, claimed that no two men had to sleep together during this Christmas holiday; and did not recall any instance where defendant and IR had to share a bed. According to IR, he and defendant woke up early in the morning because IR had accidentally touched defendant's penis, which was erect at the time, in his sleep. IR claimed that he and defendant both "felt something," and defendant asked IR if he would give him "head," meaning oral sex. IR agreed and performed oral sex on defendant. This encounter was the culmination of a "crush" that IR had developed for defendant over the years prior.

Frequently, defendant would cross the street to use the internet at IR's house, because defendant's home did not have wireless internet access. IR testified that on one of these occasions, shortly after the first sexual encounter, he was lying on a couch on the main floor of the house, watching cartoons. IR was "acting asleep," but then began to signal to defendant, by poking or touching him, that he wanted to engage in sex. Once defendant accepted his "signals,"

---

[3] *People v Gonzalez-Raymundo*, unpublished order of the Court of Appeals, entered September 5, 2013 (Docket No. 316744).

[4] *People v Gonzalez-Raymundo*, unpublished order of the Court of Appeals, entered February 19, 2014 (Docket No. 319718).

[5] *Id.*

[6] On cross-examination at trial, IR admitted that he had previously testified that he had crawled into defendant's bed in the morning, and had not slept in the same bed as defendant.

the two went into a bathroom located in the basement of the home. IR testified that he again performed oral sex on defendant, and that after this second act of oral sex, defendant told him that their sexual activity had to stay secret. IR agreed not to tell anyone.

A few months later, in May, IR saw defendant getting ready for a soccer game that he was going to play at a nearby park. IR testified that he was "tired of being in [his] house," so he asked Llamas if he could go to the park with defendant. Llamas told him it was fine as long as defendant did not mind. IR went across the street to defendant's house to ask if he could accompany him to the park. When IR entered defendant's bedroom, defendant was lying in bed. IR testified that he and defendant began engaging in their "usual ritual," in which IR would perform oral sex on defendant, and that the encounter ended in anal sex, with defendant's penis penetrating IR's anus. IR was not yet 13 years old. IR testified that, after these initial encounters, the two would sporadically engage in either oral sex or anal sex, generally every few weeks or so.

IR turned 13 years old shortly before he began eighth grade. He testified that he remembered sneaking out of his parent's house late at night on a school night, sometime in the winter after he had turned 13. On that night, IR waited approximately 30 minutes after he heard the television turn off in his parents' bedroom, put on some pants, and then snuck downstairs, being extremely quiet because his mother was a very light sleeper. Using his mother's cell phone, IR sent defendant a text message stating that he was in the mood to have sex and asking whether defendant wanted him to come over. Defendant responded that he did want IR to come over. IR then deleted the text messages from his mother's cell phone. IR walked across the street and let himself into defendant's home; the two engaged in both oral and anal sex.

IR testified that, between the ages of 13 and 14, he snuck out of his parents' house on numerous occasions to engage in oral and anal sex with defendant. On some nights, IR would watch defendant's home, and if defendant flicked his bedroom light on and off, IR knew that to mean that defendant was interested in having sex that night. IR testified that the last time he and defendant engaged in sexual relations was in January of 2012. Overall, IR estimated the two had engaged in oral sex approximately 30 times and anal sex approximately five times.

IR testified that he never told any of the adults in his family about his relationship with defendant, but that his mother and some other family members had "suspicions." For example, when the family would have large barbeques, IR and defendant would act strangely toward each other, and IR believed other people could tell that something sexual was occurring. In the middle of February of 2012, IR's biological father, David Rivera, discovered the relationship between defendant and IR. It was a Sunday afternoon and IR was asleep when he awoke to hear Rivera yelling, telling Llamas that someone "was gonna [sic] die, that he was really gonna [sic] pay for what he did." He had discovered IR's iPod, on which IR had sent a message to a friend regarding his sexual relationship with defendant. Rivera then walked to IR's room and asked him if defendant had ever touched IR in an inappropriate way or if they had ever had sex. IR was unable to answer and hung his head low, and Rivera "just knew" at that point. Rivera, who was employed as a firefighter, threw his firefighter's axe into his car, but never actually attacked defendant.

Before his father discovered the relationship, IR had already told his brother and two friends about it. After Rivera found out about the relationship, he required IR to report the sexual acts to the Lincoln Park police, even though IR did not want to press charges against defendant. IR also participated in "Kids-Talk,"[7] to explain what had happened with defendant. He also went to a doctor to be examined for evidence of sexual activity, but no such evidence was found. IR testified that after he reported the incident and spoke to "Kids-Talk," his mother, Llamas, called him a liar and did not believe the things he claimed regarding his relationship with defendant.

On March 28, 2013, the parties appeared before the trial court for an evidentiary hearing regarding text messages found on IR's iPod. An interpreter was provided for defendant at this hearing.[8] At the conclusion of the hearing, the trial court ruled that all of the text messages found on IR's iPod, apart from those that mentioned defendant, were protected by the rape shield law, MCL 750.520j, and were therefore inadmissible.

The parties appeared for trial on April 1, 2013. Before voir dire, the following colloquy occurred:

*DEFENSE COUNSEL:* Final matter of housekeeping, Your Honor, is as [sic] a Hispanic I know that sometimes folks can take offense to people speaking Spanish rather than English.

And I want to avoid the chance of any prejudice, so we'd like to preserve the right to waive the interpreter during the course of the proceedings and explain things to the defendant on break. And you can hear straight from the defendant's mouth if you like, Your Honor, this is indeed our wish.

We will accept any prejudice that might be done for his minimal lack of understanding during the course of the proceedings in order, in exchange for the safeguard against any potential prejudice amongst jury members or folks who don't look too kindly upon those who don't speak English as a first language.

And, again, I do say that with -- as one with experience.

*THE COURT:* You don't have any objection to that?

*PROSECUTOR:* I think that's a very strange thing that they are going to think [sic], so I think that they are making that decision that they shouldn't be

---

[7] Although the record provided to this Court does not further identify "Kids Talk," from context it appears that IR was referring to the Kids-Talk Children's Advocacy Center, which provides investigation and treatment for child victims of physical and sexual abuse, neglect, and psychological trauma. These services include forensic interviewing. See www.guidance-center.org/kids-talk (last accessed October 21, 2014).

[8] Defendant was also provided with an interpreter at his preliminary examination.

questioned as ineffective because they have also indicated that he has -- it sounds to me, based on what defense counsel's indicating, is that the client could, for the most part, could understand, with minimal exception they would need the interpreter. And certainly that's something that he could also voir dire on.

Following a recess, the case proceeded to trial without the trial court having further addressed the issue. At the conclusion of the prosecution's case in chief, defendant moved for a directed verdict. The trial court found that there was sufficient evidence to allow the case to go to the jury, and denied defendant's motion. At the conclusion of trial, defendant was found guilty of four counts of third-degree criminal sexual conduct, MCL 750.520d(1)(a) (victim at least 13 years of age but less than 16 years of age), and was acquitted of a fifth count of third-degree criminal sexual conduct, MCL 750.520d(1)(a).

The parties appeared for sentencing on May 6, 2013. Defendant used an interpreter during the sentencing proceedings. Defendant did not make a statement on his own behalf. At the conclusion of sentencing, defendant was sentenced as described above.

Defendant appealed his convictions by right on June 12, 2013. On August 7, 2013, defendant filed a motion to remand the case to the trial court to conduct a *Ginther* hearing. Defendant argued that he had been denied his state and federal rights to the effective assistance of counsel because defense counsel had (1) failed to conduct a jury voir dire to determine if the jury would have been prejudiced by defendant's need for an interpreter, (2) waived defendant's right to an interpreter at trial despite defendant's need for such translation, (3) failed to investigate and meet with exculpatory witnesses, and (4) failed to properly inform defendant of his right to testify at trial. Defendant supported his motion with affidavits from Llamas and Gonzalez. In her affidavit, Llamas stated that defendant barely speaks any English, defendant needed a translator at trial, she did not believe that defendant committed the crimes alleged, and she would have testified had she been called by defendant's trial counsel. Gonzalez stated in his affidavit that defendant barely speaks any English, defendant needed a translator at trial, and trial counsel only prepped him on the day of trial and only for five minutes. This Court granted defendant's motion on September 5, 2013.

The parties appeared before the trial court for a *Ginther* hearing on October 28, 2013. Defendant's trial counsel testified that he had been an attorney for 18 years, approximately 10 to 15% of his practice involved criminal matters, and defendant's trial had been his second as first-chair criminal defense attorney. Trial counsel also testified that defendant's primary language was Spanish and that he had primarily spoken with defendant in Spanish because defendant's English proficiency was limited. Trial counsel also testified that an interpreter had been present for the entire trial and on breaks the interpreter would "catch [defendant] up" on anything that had occurred during the trial proceedings about which defendant was confused. Trial counsel further testified that, to his recollection, defendant had known and understood why counsel had declined the assistance of an interpreter during trial, and that defendant was "okay" with that. Trial counsel had explained to defendant that he thought that having an interpreter would look bad not only because of possible jury prejudice against non-English speakers, but also because having someone whisper in defendant's ear could look bad to the jury. Finally, trial counsel testified that he had decided not to call Llamas as a witness because IR had already testified on cross-examination that his mother did not believe that defendant had had sexual relations with IR

-5-

and Llamas could not add much to that, and additionally, because she was a conflicted witness, as the victim was her son. An associate in trial counsel's firm, Stephanie Labelle (known during the trial as Stephanie Judd), also testified that an interpreter was not used during trial due to fears of jury bias against a non-English speaking defendant.

Llamas testified at the *Ginther* hearing that defendant's primary language was Spanish, that he previously lived in Mexico before moving to the United States approximately seven years before the hearing, and that he did not speak English either at work or socially. Additionally, the only conversation Llamas had with defendant's trial counsel was in the hallway outside the courtroom on the first day of trial, and the conversation only lasted about five minutes. Llamas wanted to testify because she "wanted the truth to come out," and she did not believe IR's allegations against defendant.

The parties returned for the court's ruling on defendant's motion for a new trial on November 22, 2013. The trial court found that it had erred when it did not have defendant personally waive simultaneous translation, instead accepting trial counsel's word on the subject. On that basis, the trial court granted defendant's motion for a new trial. When asked to clarify, the court noted that its error was structural, and held that, even if it were not, trial counsel had been ineffective and defendant had been prejudiced by not "getting [the cross-examination of the victim] in real time and able to respond to that in a timely fashion to be able to ask questions." An order was entered that same day to reflect the trial court's ruling.

The prosecution filed with this Court its delayed application for leave to appeal on December 23, 2013. The prosecution argued that the trial court had erred in granting defendant a new trial because trial counsel's strategic decision regarding simultaneous translation was not a structural error, and because defendant did not meet his burden of showing prejudice. This Court granted the prosecution's application for leave to appeal on February 19, 2014. Further, this Court consolidated the prosecution's appeal with defendant's pending appeal, in the same order, on February 19, 2014.

## II. MOTION FOR NEW TRIAL

As this issue is dispositive of the case before this Court, we address the prosecution's appeal first. The prosecution contends on appeal in Docket No. 319718 that the trial court abused its discretion in granting defendant's motion for new trial on remand. We disagree.

### A. STANDARD OF REVIEW

MCL 770.1 provides:

The judge of a court in which the trial of an offense is held may grant a new trial to the defendant, for any cause for which by law a new trial may be granted, or when it appears to the court that justice has not been done, and on the terms or conditions as the court directs.

"This Court reviews a trial court's decision to grant or deny a motion for new trial for an abuse of discretion." *People v Cress*, 468 Mich 678, 691; 664 NW2d 174, 182 (2003). An abuse

of discretion occurs when the trial court chooses an outcome that falls outside the principled range of outcomes. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008).

Constitutional errors are classified as either structural or non-structural. *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000). "Structural errors are defects that affect the framework of the trial, infect the truth-gathering process, and deprive the trial of constitutional protections without which the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *People v Watkins*, 247 Mich App 14, 26; 634 NW2d 370 (2001), affirmed but criticized on other grounds 468 Mich 233 (2003). Generally, all other errors are nonstructural. *Carines*, 460 Mich at 765. When a structural error occurs, reversal is required without any showing of prejudice. *People v Cook*, 285 Mich App 420, 424; 776 NW2d 164 (2009). In contrast, a nonstructural constitutional error is subject to analysis for harmless error. *Carines*, 460 Mich. at 774.

## B.  WAIVER

As a threshold issue, although the prosecution argues that defendant waived his right to an interpreter and has thus waived appellate review of this issue, we do not find that defendant's trial counsel's statements operated to affirmatively waive defendant's rights. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *People v Carines*, 460 Mich 750, 762 n 7; 597 NW2d 130 (1999), reh den 461 Mich 1205 (1999), quoting *United States v Olano*, 507 US 725, 733; 113 S Ct 1770; 123 L Ed 2d 508 (1993). A defendant may generally waive a constitutional right. See *People v Carter*, 462 Mich 206, 217-218; 612 NW2d 144 (2000), reh den 463 Mich 1210 (2000) ("It is presumed that waiver is available in a broad array of constitutional and statutory provisions . . . [however,] the defendant must personally make an informed waiver for certain fundamental rights such as the right to counsel or the right to plead not guilty, for other rights, waiver may be effected by action of counsel.") (internal quotation marks omitted; citations omitted). This includes the waiver of the right be present during his trial. *People v Buie (On Remand)*, 298 Mich App 50, 56-57; 825 NW2d 361 (2012).[9] However, such waiver must be personal and informed. See *People v Kammeraad*, ___ Mich App ___; ___ NW2d ___ (2014), slip op at 13-14.[10] Courts must "indulge every reasonable presumption

---

[9] As discussed in Part C, the lack of simultaneous translation implicates defendant's "presence" at his trial, despite being physically present.

[10] In *Kammeraad*, this Court found that the defendant, despite his express statements that he wished to be removed from the courtroom during his trial, had not been "specifically informed of his constitutional right to be present at trial, even though the circuit court's exhaustive efforts certainly made it implicitly clear that he had a right to be present." *Id.*, slip op at 12. This Court therefore was forced to conclude that defendant had not waived his right to be present. *Id.* at 12-13. In that case, the trial court made extensive efforts, in the face of an extremely obstinate and uncooperative defendant, to secure the defendant's constitutional rights; that this Court was forced reluctantly to find those efforts inadequate indicates the strength of the dictate that courts

against the loss of constitutional rights" in assessing a waiver of such rights. See *Illinois v Allen*, 397 US 337, 343; 90 S Ct 1057; 25 L Ed 2d 353 (1970).

The lack of simultaneous translation implicated defendant's rights to due process of law guaranteed by the United States and Michigan Constitutions. US Const, Am V; US Const, Am XIV; Const 1963, art 1, § 17. Specifically, a defendant has a right to be present at a trial against him; a defendant's lack of understanding of the proceedings against him renders him effectively absent. See *Drope v Missouri*, 420 US 162, 171; 95 S Ct 896; 43 L Ed 2d 103 (1975); *People v Cunningham*, 215 Mich App 652, 654-655; 546 NW2d 715 (1996). In addition, lack of simultaneous translation impairs a defendant's right to confront witnesses against him and participate in his own defense. *Cunningham*, 215 Mich App at 654-655. The right at issue is thus not merely statutory as codified by MCL 755.19a, but constitutional, and thus subject to the every reasonable presumption against its loss.

Defense counsel, at the *Ginther* hearing, stopped well short of indicating that defendant made a personal and informed decision to waive his right to an interpreter, saying only that "this was the strategy I recommended to him and he went along with it to the point that I don't recall him making any objection" and that defendant "wasn't opposed to it." Counsel also described defendant as "very deferential" to his experience and status as a defense attorney. Under these circumstances, and where it does not appear that the trial court inquired of defendant personally concerning his awareness of his constitutional and statutory right to an interpreter, we decline to find that defendant made an informed waiver of his right to receive simultaneous translation during his trial.

### C. THE TRIAL COURT'S NONCOMPLIANCE WITH MCL 775.19a

MCL 775.19a provides in relevant part:

> If an accused person is about to be examined or tried and it appears to the judge that the person is incapable of adequately understanding the charge or presenting a defense to the charge because of a lack of ability to understand or speak the English language, the inability to adequately communicate by reason of being mute, or because the person suffers from a speech defect or other physical defect which impairs the person in maintaining his or her rights in the case, the judge shall appoint a qualified person to act as an interpreter.

Further, a trial court should appoint an interpreter when it appears from the record that a witness is not understandable, comprehensible, or intelligible, and the absence of an interpreter would deprive the defendant of some basic right. See *Warren (After Remand)*, 200 Mich App at 591-592.

In this case, the trial court, prosecution, and defense counsel all were aware that defendant was incapable of understanding English at a level necessary to effectively participate in his defense without simultaneous translation of the trial proceedings. Therefore, having failed

must indulge every reasonable presumption against the loss of constitutional rights. *Allen*, 397 US at 338.

to secure defendant's personal and knowing waiver of his right to simultaneous translation, the trial court erred in allowing defendant to proceed to trial without simultaneous translation of the trial proceedings. See *People v Sepulveda*, 412 Mich 889, 889; 313 NW2d 283 (1981) ("Notwithstanding the failure of the defendant to request an interpreter, it was error to fail to appoint an interpreter where the record clearly shows that the defendant spoke no English whatsoever."). The trial court possessed an affirmative duty to establish defendant's proficiency in English or appoint an interpreter in light of the record evidence concerning his limited understanding of English. Compare *People v Atsilis*, 60 Mich App 738, 739; 231 NW2d 534 (1975) ("[A] trial judge is not under a duty to affirmatively establish a defendant's proficiency in the English language when no evidence is presented to him that could put the issue in doubt."), and *Kammeraad*, slip op at 14 ("defendant . . . needlessly demanded an interpreter, as it is quite evident that defendant is fluent in the King's English . . . ."). We conclude that the trial court erred in failing to satisfy this duty, and that this error effectively prevented defendant from being truly present at his trial and arguably interfered with his ability to assist in his defense, including in the cross-examination of witnesses.

Defendant asserts that the trial court correctly determined that the error in this case was structural. The United States District Court for the Eastern District of Michigan, in granting a petition for habeas corpus, has in one case described the violation of a defendant's right to be present at his trial as a "structural defect" and suggested that denial of simultaneous translation was such a defect, although the court also addressed prejudice to the defendant. *Gonzalez v Phillips*, 195 F Supp 2d 893, 902-903 (2001).[11] The prosecution argues, in contrast, that the failure to provide a full and simultaneous translation is a non-structural error. It cites to an unpublished decision of this Court[12] that indeed found non-structural error, but that did so in the context of deficient, rather than non-existent, simultaneous translation. In this case, by contrast, defendant received no simultaneous translation during the trial at all. This Court also has stated that "although occasional lapses [in simultaneous translation] will not render a trial fundamentally unfair, adequate translation of trial proceedings requires translation of everything relating to the trial that someone conversant in English would be privy to hear." *Cunningham*, 215 Mich App at 655. The Court in *Cunningham* thus considered whether lapses in translation rendered the defendant's trial fundamentally unfair; however, while not directly addressing whether the error was a structural one, it remanded for further proceedings based on its inability to determine whether the error was harmless beyond a reasonable doubt. The parties have therefore presented us with authority that is both arguably conflicting and distinguishable from the instant case; neither party has presented binding authority to this Court on the precise issue of whether the complete lack of simultaneous translation during a trial is a structural error such as would require us to affirm the trial court's grant of a new trial even absent a showing of prejudice.

---

[11] Decisions of lower federal courts are not binding on this Court. *Abela v General Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[12] Unpublished decisions of this Court are not binding on future panels of this Court. MCR 7.215(C)(1).

We conclude, however, that we need not decide whether the complete lack of simultaneous translation in the instant case is a structural error, because even if we were to subject the trial court's error to harmless error analysis, we would conclude in this case that the error was not harmless and that it prejudiced defendant. The trial court found that defendant was specifically prejudiced by the lack of translation of IR's testimony. In *Cunningham*, 215 Mich App at 657, this Court noted that *inadequate* (rather than absent) translation of the complainant's cross-examination responses was subject to harmless error analysis, with the burden of proof resting on the prosecution to prove the error was harmless beyond a reasonable doubt. This Court in that case was unable to determine if the error prejudiced defendant due to an inadequate record. *Id.* Further, this Court has noted that exact translation of witness testimony is more important than translation of attorney colloquy. *People v Truong (After Remand)*, 218 Mich App 325, 333; 553 NW2d 692 (1996).

In this case, defendant's trial was essentially a credibility contest between himself and IR. Defendant lacked the ability, due to the denial of simultaneous translation, to assist his counsel in cross-examining IR. Defendant asserts, for example, that he could have refuted IR's testimony that defendant signaled IR using the lights from his house, refuted IR's testimony that Llamas instructed IR to share a bed with defendant, and refuted IR's characterization of him as a homosexual, had he been aware that IR had so testified. Further, defendant asserts that his waiver of his right to testify was not made knowingly due to his lack of understanding of what IR had testified to at trial. At the *Ginther* hearing, trial counsel described defendant's communication with him during trial as "not much" and said "we might have passed one note [in Spanish]." Although defense counsel also indicated at the hearing that defendant was able, prior to trial, to communicate his version of events sufficiently for defense counsel to prepare a trial strategy, it does not appear that defense counsel was able to modify that strategy with input from defendant in response to answers received during either direct examination or cross-examination of IR. On the record before this Court, we therefore conclude that the trial court did not err in determining that the lack of simultaneous translation was prejudicial to defendant.

We share the prosecution's concern that defendants may waive their right to an interpreter and later claim error on appeal resulting from it, thereby harboring error in the form of an "appellate parachute." However, we note that in this case the trial court primarily based its grant of a new trial on *its own* failure to follow the dictates of MCL 775.19a, which requires the appointment of an interpreter if "it appears *to the judge* that the person is incapable of adequately understanding the charge or presenting a defense to the charge because of a lack of ability to understand or speak the English language." *Id.* (emphasis added). While a trial court is not required to inquire into a defendant's ability to comprehend English when no evidence of any limitation is presented to it, see *Atsilis*, 60 Mich App at 739, *Kammeraad*, slip op at 14, it should, when presented (as in this case) with indications that a defendant may lack sufficient comprehension of the English language, either satisfy itself of defendant's proficiency, provide for simultaneous interpretation, or, in the case where a defendant wishes to waive such a right, secure the defendant's personal, informed waiver. *Id.*; *Carter*, 462 Mich at 217-218; *Kammeraad*, slip op at 13-14. Such an approach should alleviate concerns that a defendant may harbor appellate error.

Because we affirm the trial court's grant of a new trial in Docket No. 319718, we decline to address as moot the issues presented in defendant's appeal in Docket No. 316744, as there is

-10-

no relief this Court can grant.  *In re Contempt of Dudzinksi*, 257 Mich App 96, 112; 667 NW2d 68 (2003).  In light of our affirmance of the trial court's grant of a new trial, we do not reach the issue of the effectiveness of defendant's counsel under *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).[13]

Affirmed in Docket No. 319718 and remanded for further proceedings consistent with this opinion.  Dismissed as moot in Docket No. 316744.  We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly

---

[13] We note that we have found no cases where a defense counsel's failure to request an interpreter, or affirmative waiver of an interpreter, under circumstances where the record evidence satisfies MCL 775.19a, has been deemed objectively reasonable conduct on the part of the defense attorney.